### AT

## GENERAL TERM,

### July, 1891.

61   53
63   450

61h   53
67 AD⁷334

## THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE EDISON ELECTRIC ILLUMINATING COMPANY OF NEW YORK, Relator, *v.* EDWARD WEMPLE, Comptroller of the State of New York, Defendant.

*Taxation — electric-lighting companies — electricity is not a manufacture — electric companies were not exempt from taxation upon their business or franchise prior to the passage of chapter 353 of 1889 — method of computing penalties under section 2, chapter 361 of 1881 — chap. 542 of 1880 — appeal, under section 1, chapter 361 of 1881, how limited.*

An electric-lighting corporation was incorporated in 1880, under chapter 37, Laws of 1848, relating to the formation of gas-light companies, which companies were, by chapter 512, Laws of 1879, authorized to "use electricity instead of gas." The corporation in question never produced anything but electricity. The comptroller of the State of New York settled an account against said corporation for taxes in the years from 1881 to 1885, inclusive, upon its "franchise or business," alleged to be due the State of New York, under chapter 542, Laws of 1880, as amended by chapter 361, Laws of 1881, and other acts.

In a proceeding brought by said company to revise and resettle said account, upon the ground that it was a manufacturing corporation, and as such was exempt from said tax:

*Held*, that electricity exists in nature, is collected or gathered, and is not manufactured, and that said company was not a manufacturing corporation.

Section 3 of chapter 361, Laws of 1881, imposed the tax in question upon "every corporation, * * * except manufacturing corporations;" further providing that such "exception shall not be taken to include gas companies." Chapter

353, Laws of 1889, amended said section 3 by excluding from the exemption " electric or steam heating, lighting and power companies."

*Held,* that the said amendment of 1889 was not a legislative declaration that electric companies were previously within the exemption.

That the circumstances under which such an amendment is enacted are to be considered in its construction, and these may be such as to make the amendment declaratory, not of a change in the law, but of the legislative opinion as to what its proper construction should have been.

That although a part of the relator's capital stock was invested in patent-rights, yet as the tax was, by the statute, declared to be one upon the " corporate franchise or business," such an investment did not affect it, and no deduction should for that reason be made from the tax.

Section 2 of chapter 361 of the Laws of 1881 provides that if a company is in default in making a proper report to the comptroller, and in paying the tax, the comptroller shall add ten per cent for each and every year for which such report was not furnished, or for which said tax was not paid.

*Held,* that this provision did not mean that ten per cent should be added to the tax for every year that the tax was in default, but that ten per cent should be added to every year's tax that was in default. (MAYHAM, J., dissenting upon this point.)

*Semble,* that the appeal given by section 1 of chapter 361 of 1881 is confined to those cases in which the company is dissatisfied with the account, as settled by the comptroller where he is not satisfied with the valuations returned to him by the company.

Where the comptroller entertains and denies an application for a readjustment of the account a *certiorari* is proper.

HEARING upon the return to a writ of *certiorari* granted upon the petition of the relator, the Edison Electric Illuminating Company of New York, against the respondent, Edward Wemple, Comptroller of the State of New York, to review his proceedings in levying and assessing certain taxes upon the franchise and business of the relator, under chapter 542 of the Laws of 1880, as amended by chapter 361, Laws of 1881, and by other acts.

The relator was incorporated in December, 1880, under chapter 37, Laws of 1848, entitled " An act to authorize the formation of gas-light companies." Chapter 512, Laws of 1879, authorized companies incorporated under said act of 1848 to " use electricity instead of gas," and to adapt their plant and business accordingly. The relator has always used electricity, and has not produced gas-light. Its sole business is and has been the production and marketing of light by means of electricity.

The full amount of the capital stock of the relator for the years 1881 to 1885, inclusive, was $1,000,000, all of which was not issued

and a portion whereof was issued for patent-rights. The comptroller in February, 1890, made an appraisement of the capital stock for each of the five years from 1881 to 1885, inclusive, making no deduction for the amount thereof issued for patent-rights, and he stated and settled an account against it for the taxes due the State upon its franchise and business under chapter 542, Laws of 1880, and chapter 361, Laws of 1881, and the acts amendatory thereof, amounting, with the penalties added, to the aggregate of $5,090.45. This sum the relator paid, and subsequently applied to the comptroller under section 19 of the act of 1880, as added thereto by chapter 463, Laws of 1889, to revise and resettle the same upon the ground that it was exempt therefrom, because it was a manufacturing corporation and because a part of its capital was invested in patent-rights, and read affidavits to support its claim for exemption. Affidavits were read in opposition. November 26, 1890, the comptroller made an order denying the application, and thereafter this writ of *certiorari* was issued, pursuant to section 20 of the act of 1880, as added thereto by said chapter 463, Laws of 1889.

*I. H. Maynard*, for the Comptroller.

*S. B. Eaton* and *E. H. Lewis*, for the relator.

LANDON, J. :

We held in *People ex rel. American Contracting and Dredging Company* v. *Wemple* (60 Hun, 225) that the practice in that case, which is substantially the same as in this, was authorized, and brought up for review both the law and the facts upon which the relator's claim of erroneous or illegal taxation, in whole or in part, was based. We, therefore, pass to the consideration of this case upon its merits.

The relator presents two objections to the imposition of the tax in question :

*First.* That it is a manufacturing company, and is, therefore, by the terms of the statute, exempt from the tax.

*Second.* That that portion of the capital stock of the relator invested in patent-rights was not liable to any taxation by the State. It also claims that the cumulation of penalties is erroneous.

Whether the relator was incorporated under the gas companies act, or under the comprehensive industrial act of 1848 (chap. 40),

with its many amendments and additions, usually called the manufacturing act, we do not deem material. In either case no question is made as to its right to obtain electricity and use and supply electrical currents for illuminating purposes. It is an electric-lighting company. Whether such a company is a manufacturing company seems to depend upon the question whether electricity is manufactured by the relator, or whether it is already in existence, and is simply collected or gathered by the relator and utilized. The processes adopted by the relator are stated in the case, and we have the differing opinions of learned experts laid before us. As a scientific question it would seem to be still in the debatable stage. Something also seems to depend upon the definition of terms. We cannot repose with much confidence upon the conclusion of the learned comptroller. Following our impressions, however crudely formed they may be, we conclude that electricity exists in a state of nature, and that the relator collects or gathers it and does not manufacture it. We refrain from any exposition of the premises upon which this conclusion is based. If this conclusion is true, the relator is not a manufacturing corporation, and, therefore, not within the exemption of the statute.

The relator, however, contends that it is manifest from the legislation upon the subject that electric-light companies were exempt from the franchise tax until the passage of chapter 353, Laws of 1889, and, therefore, exempt during the years here in question. Section 3 of chapter 361, Laws of 1881, provided that "Every corporation * * * except manufacturing corporations carrying on manufacture within this State, which exception shall not be taken to include gas companies or trust companies, shall be subject to and pay a tax, as a tax upon its corporate franchise or business, into the treasury of the State annually," etc. Chapter 353, Laws of 1889, amended the section by excluding from the exemption "electric or steam heating, lighting and power companies." The relator contends that that amendment is a legislative declaration of opinion that electric companies were previously within the exemption. (*People* v. *Knickerbocker Ice Co.*, 99 N. Y., 181, and *People* v. *N. Y. Floating Dry Dock Co.*, 92 id., 482, are cited.) In the first case the ice company sought exemption from the franchise tax, alleging that it was a manufacturing corporation. It collected and marketed naturally

formed ice. The court held that it was not a manufacturing company. It was incorporated under the so-called manufacturing act (chap. 40, Laws of 1848), as the act was supplemented by chapter 301, Laws of 1855, extending its provisions to companies formed for collecting, storing, preserving and vending ice. The court held that the supplementary act indicated the legislative opinion that such ice business was not embraced within the terms of the original act. The conclusion seems, under the circumstances, to be just. The *Dry Dock Case* presented similar features and a similar ruling was made.

So it might be assumed that the enlargement of the gas companies act, so as to permit such companies to use electricity, implied that before the enlarging act the companies could not use electricity. But the addition of electric companies to the non-exempt companies may have been either to enlarge the non-exempt list, or to settle an unwarranted claim to exemption raised by the electric companies. If the legislature regarded these companies as non-manufacturing, then the amendment of 1889 should be construed as setting the contrary claim at rest.

The case of *People ex rel. Westchester Fire Insurance Company v. Davenport* (91 N. Y., 574, 591), holds that the circumstances under which an amendment is enacted are to be regarded in construing its effect; and if the circumstances imply a repudiation by the legislature of the construction sought by interested parties to be placed upon the original act, the amendment instead of being declaratory of a change in the law is to be regarded as the legislative opinion of its proper construction. Applying this rule we see that lighting by electricity is more recent than lighting by gas; that the practical result is much the same; that the propriety of imposing a tax upon an electric-lighting company is not obviously distinguishable from the propriety of imposing it upon a gas company; that one company may perform either or both kinds of service; that the gas companies were placed in the list of non-exempts because the court held that the companies which manufactured illuminating gas were manufacturing companies (*Nassau Gas-Light Company v. Brooklyn*, 89 N. Y., 409); that if electricity is also a manufacture it is less easily determinable to be so. When, therefore, the electric companies claimed an exemption, which had been denied

to the gas companies and was denied to non-manufacturing companies, we can readily understand that the amendment of 1889 was the legislative response to such a claim and a repudiation of it.

We conclude that the defendant was not entitled to the exemption claimed.

Although a part of the relator's capital stock was invested in patent-rights no deduction should be made from the tax upon that account. The tax is declared by the statute to be upon the "corporate franchise or business," and as said in *Home Insurance Company* v. *New York* (134 U. S., 594, affirming same case in 92 N. Y., 328), "it cannot be affected in any way by the character of the property in which the capital stock is invested." The same case requires us to overrule the constitutional objection presented.

The Comptroller added to the taxes for 1882 a penalty of eighty per centum, and also added a penalty of ten per centum for each of the years during which payment of the taxes for the years 1883 to 1885, inclusive, had been in default. Section 2 of chapter 361, Laws of 1881, provides that in case the company defaults in making the proper report to the Comptroller, and in paying the tax, that "It shall be the duty of the Comptroller of the State to add ten per centum to the tax of said corporation, company or association for each and every year for which such report or certificate of appraisment and oath or affirmation were not so furnished, or for which such tax shall not have been paid." We think the penal portion of this section should be construed favorably to the relator; that the language used does not necessarily import that ten per centum shall be added every year that the tax is in default, but is satisfied by adding ten per centum to every year's tax that is in default. The clauses of the paragraph may be transposed thus: "add ten per centum to the tax for each and every year of said corporation," etc., and the meaning is clearer.

· The determination of the Comptroller must be modified by deducting from the aggregate of the taxes and penalties the aggregate of the excess of the penalties above ten per centum, and as so modified affirmed, without costs, and the said excess must be restored to the relator.

LEARNED, P. J., concurred.

MAYHAM, J. :

The respondent insists that section 1 of chapter 361 of the Laws of 1881 furnishes a tribunal to which the relator could have appealed within a given time after the assessment and notification of this tax, and having failed to make such application no *certiorari* will lie to review the action of the Comptroller. Chapter 361 of the Laws of 1881 amends chapter 542 of the Laws of 1880 by substituting the act of 1881 for the act of 1880, so that the latter act as amended stands in the place of the former. Section 1 of chapter 361 of the Laws of 1881 provides a general method for ascertaining or making a valuation by the Comptroller, and settling an account upon the valuation so made for the taxes, penalties and interest due the State thereon. "And any association, corporation or joint-stock company dissatisfied with the account so settled, may, within ten days, appeal therefrom to a board consisting of the Secretary of State, Attorney-General and State Treasurer, which board on such appeal shall affirm or correct the account so settled by the Comptroller; and the decision of said board shall be final; but such appeal shall not stay proceedings, unless the full amount of the taxes, penalties and interest as due on such account as settled by the Comptroller, be deposited with the State Treasurer." It will be observed that this appeal is provided for when the Comptroller is not satisfied with the valuation made and returned by the company, he is authorized and empowered to make a valuation thereof, and settle the account upon the valuation so made, and impose the taxes, penalties and interest due the State thereon, and the corporation dissatisfied with the account so made may appeal to the officers above specified. It would seem from this case that the Comptroller did not dissent from the report of the company when made, but the report of the commissioner was based upon the enforced reports made by the company under protest; and his final imposition of tax and interest was predicated upon these reports, and the dissatisfaction does not appear to be so much with the account settled as with the right or power of the Comptroller to impose a tax upon it, upon the assumed ground that it was a manufacturing corporation doing business wholly within this State. The power of appeal given by section 1 of chapter 361 of the Laws of 1881 is confined to cases where the company is dissatisfied with the account so settled, that

is, settled by the Comptroller where he is not satisfied with the valuations returned to him by the corporation. It is not clear, therefore, that the appeal given by this section is applicable to a case of this kind. If it is, and is the only remedy provided by law, the relator would be compelled to pursue it or be remediless; at least, it could not ignore this remedy and resort to one by *certiorari*, as that writ could not issue, but would be expressly prohibited by section 2122 of the Code of Civil Procedure, which prohibits the issuance of the writ of *certiorari*, " where the determination can be adequately reviewed by an appeal to a court, or to some other body or officer." The language of this provision of the Code is plain, and the rule which it declares is the settled law as established by a uniform current of decisions, both before and since the enactment of the Code. But if this case shall be held to come within the provisions of section 1 above quoted, authorizing an appeal to the officers therein named; has not sections 19 and 20, which were added to this chapter by the provisions of chapter 463 of the Laws of 1889, made a *certiorari* applicable to this case? Section 19 of this chapter authorizes the comptroller to readjust any account theretofore settled by him in a proper case therein specified; and section 20 provides that " the action of the Comptroller, upon any application made to him by any person or corporation for a revision and resettlement of accounts, as provided in this act, may be reviewed, both upon the law and the facts upon *certiorari* by the Supreme Court at the instance either of the party making such application or of the Attorney-General in the name and in behalf of the people of this State, and for that purpose the Comptroller shall return to such *certiorari* the accounts and all evidence submitted to him on such application."

In the case at bar the relator applied to the Comptroller for a revision and readjustment of the several accounts for tax, and the Comptroller made an order denying such revision or readjustment, assuming to base his action upon chapter 542 of the Laws of 1880, and the several acts amendatory thereof, of which section 20 above quoted is one of the last amendments. We are, therefore, inclined to the opinion that a writ of *certiorari* may properly be resorted to by the relator to review the action of the Comptroller in this case.

This brings us to the consideration of the main or most important

question in this case upon the merits. Is this corporation taxable under the provisions of section 3 of chapter 361 of the Laws of 1881? That section provided that: " Every corporation, joint stock company or association whatever, now or hereafter incorporated or organized under any law of this State, or now or hereafter incorporated or organized by or under the laws of any other State or country and doing business in this State, except savings banks and institutions for savings, life insurance companies, banks and foreign insurance companies and manufacturing corporations carrying on manufacture within this State, which exceptions shall not be taken to include gas companies or trust companies, shall be subject to and pay a tax, as a tax, upon its corporate franchise or business," etc.

The relator claims that it is a manufacturing corporation doing business in this State, and, therefore, exempt from this tax by the terms of the statute. On the other hand, the Comptroller insists that the relator is not a manufacturing corporation within the just meaning of that term, and is not within that exception in the statute ; and this contention between the parties the court seems called upon to consider and decide. The relator, although incorporated as a gas company (the effect of which we may consider later) is, as it alleges in its petition, engaged as a manufacturer and seller of electric currents for the purpose of illumination. The relator in its petition, which was presented to the Comptroller on the application for the revision and readjustment of this tax, describes the process in use by the relator for the carrying on of its business of electrical illumination substantially as follows : A steam engine is used as a motive power, for the propulsion of machinery attached to a driving wheel which, by means of a belt connected with another wheel or pulley of the dynamo, turns or revolves the armature. The armature is a coil of wire wound on a metal core and mounted on a shaft and is revolved by the power communicated from the engine through the means of the belt. The armature is revolved within or between the ends of a large horse-shoe magnet, the opening of which is downward. The magnet is made by winding a soft iron horse shoe or soft curved horse-shoe-shaped iron with a coil of conducting wire, and sending through the coil a current of electricity. When once vitalized by such current the magnet never loses this magnetic property, even after the current stops, but is ever afterwards available for the purpose of electric

currents upon the armature being revolved between the poles of this magnet. By the rapid revolution of the armature, within what is termed the field of force between the poles of the magnet, this mysterious force or energy is accumulated known as electricity, and is thence conducted over copper bars or mains throughout the territory or city in which it is used, and is distributed on smaller wires or mains to the houses or places which are to be lighted. On the part of the relator it is claimed that the electricity and electric light thus collected or produced does not come into being until the revolution of the armature in the field of force as above described. That it has no existence until such revolution, and when the revolutions begin the electricity is developed in a minute quantity, and that the electricity thus produced is a new body; and this contention is sought to be reinforced by the claim that the latent energy in the coal by the combustion of which heat is produced is a factor in electricity, and that it is not unlike the production of gas which is generated from coal, when heated in a retort. But this reinforcing argument fails when we consider that the power which revolves the armature could be as effectually produced by water or horse power as by steam. It is not, therefore, the latent energy that may exist in coal, but that subtle and mysterious power or energy which either exists in nature, and is drawn by these appliances from nature's store-house or is the product collected by them from some impalpable, intangible and unknown raw material.

As this is a corporation and must, if relieved from the payment of tax, bring itself within the exceptions, the burden is, we think, upon it to establish its exemption by proving itself to be a manufacturing corporation. It is quite clear that the common and usually accepted signification of the words or phrase "manufacturing corporations" is a corporation organized for the production of some merchantable commodity out of raw materials, or the change of the form of one material substance into another. Webster defines the word "manufacture" to mean "to make, or fabricate, raw materials by hand, by art or machinery, and work into forms convenient for use; and, when used as a noun, "anything made from raw materials, by hand, or by machinery, or by art." Within these definitions it is difficult to see how electricity, even when utilized by means of ingenuity and brought into service, can be termed a manufactured com-

modity, or how the process of its utilization can be held to be manufacturing electricity or manufacturing electric lights.

Electricity is defined by Webster as "a power in nature." Lynch, one of the defendant's witnesses, says: "The energy or current that is given forth upon the circuits cannot, therefore, be spoken of as a manufactured product, but is always referred to as a result." And he adds: "The generation of electricity may be considered as a power drawing a supply of electricity from Nature's Well, and the nearest practical illustration would be a series of pumps drawing water from a well and sending same through a series of pipes." And, as another illustration, he says: "It would be the controlling of the flow of the natural gas wells and sending same to some distance, as is practically illustrated at Pittsburg." Another witness says: "While the nature of electricity is not thoroughly understood, it is admitted to be a mere form of energy, and not a material substance in any sense of the word, and, therefore, not capable of manufacture." It is quite clear that the legislature, in imposing this tax and creating the exemptions therefrom, intended to use the words "manufacturing corporations" in their ordinary sense, and so the courts of this State have uniformly held that where the corporation is engaged in gathering natural products or material existing in nature it is not a manufacturing corporation.

In the *People* v. *The Knickerbocker Ice Company* (99 N. Y, 182), the court distinctly held that the collection of an article existing in nature, such as ice, and storing it for use and sale, was not a manufacturing company within the meaning of this statute. To the same effect is the case of the *People* v. *The New York Floating Dry Dock Company* (92 N. Y., 487); and where similar questions have arisen in other States, the rule contended for by the comptroller in this case has been sustained. (*Byers* v. *Franklin Coal Company*, 106 Mass., 131; *Dudley* v. *Jamacia Pond Aqueduct*, 100 id., 183; *Frazee* v. *Moffitt*, 20 Blatchford, 267.) And in the recent case of the *Commonwealth of Pennsylvania* v. *The United States Electric-Light Company*, decided in June, 1888 (see 7 Pa. County Court Rep., 90), the court, in an elaborate opinion, pronounced upon a statute similar to the one under consideration in this case, and by cogent argument demonstrated that neither electricity or light produced by it is a material substance capable of manufacture; and that the electric-light

company was not, therefore, a manufacturing company within the meaning of the statute exempting manufacturing companies from taxation upon their capital stock and franchise. Holding, as it does, the affirmative upon this subject, and assuming, as it must, the burden of bringing itself within the exemption it claims (Cooley on Taxation, 146; *Academy of Fine Arts* v. *Philadelphia County*, 22 Pa. St. Rep., 496; *The People ex rel. Osgood* v. *Comr. of Taxes*, 99 N. Y., 154) we think the relator has failed in its contention upon this point; especially when we take into account the legislative intent as manifested by the amendment of section 3 of chapter 361 of the Laws of 1881, as amended by chapter 353 of the Laws of 1889, which expressly provides that the exemption from taxation " shall not include gas companies, trust companies, electric or steam-heating, lighting and power companies," and therein expressly provides that they shall pay a tax upon their franchise and business. It is true that the amendment was passed after the time for the accruing of the taxes imposed by the Comptroller in this case; but it appears to be a clear legislative expression of the intent with which the original act was passed, and being a statute, *in pari materia* with that act, may be taken as indicative of the legislative intent in aid of a construction of its provisions when doubt has been cast upon the true meaning of the original act. In *People ex rel. Westchester Fire Insurance Company* v. *Davenport et al.* (91 N. Y., 592, 593), the court, in discussing this subject says: " The force which should be given to subsequent, as affecting prior legislation, depends largely upon the circumstances under which it takes place. If it follows immediately, and after controversies upon the use of doubtful phraseology therein have arisen as to the true construction of the prior law, it is entitled to great weight." But independently of this apparent legislative interpretation, we are of the opinion that the corporation seeking exemption in this case does not come within the exception contained in the original act. The Comptroller, as a public officer, is charged with the duty of imposing the taxes and penalties provided for in these acts of the legislature, and his acts and determinations cannot be reversed by the courts unless it clearly appears that his determination was against the weight of evidence upon questions of fact, or unless it clearly appears that his conclusions of law were erroneous. (Code of Civil

Pro., § 2140.) In support of a claim to reduce or modify an assessment made by a public officer having jurisdiction of the party and subject-matter, it must be made to appear affirmatively that the assessment is in part or in whole erroneous. (*The People ex rel. Osgood* v. *The Commissioner of Taxes of N. Y.*, 99 N. Y., 154.)

It is insisted by the relator that a part of the tax imposed is upon patents granted by the United States, which are exempt from taxation under State laws or State authority. If this were a property tax, there might be great force in the contention of the relator upon this point, but it is not, but a tax upon the franchise. The franchise is a grant from the State, and the legislature has, by virtue of its jurisdiction over corporations organized under its laws, authority to impose such a tax, and the Court of Appeals have expressly held that in taxing corporations under chapter 542 of the Laws of 1880, as amended, the State authorities are not required to deduct the amount of stock which the corporation holds in United States bonds from the total amount of its capital stock, and to compute the tax only upon dividends derived from the remainder. (*The People of the State of New York* v. *The Home Ins. Co.*, 92 N. Y., 328.) Upon all the questions raised by the relator by the *certiorari* and presented in this case, I think no substantial error is shown to have been committed by the Comptroller in the imposition of this tax. Nor do I think the additions of interest annually was improper. The language of section 15 of chapter 501 of the Laws of 1885 is as follows: "All accounts hereafter settled by the comptroller, agreeably to the provisions of this act, shall bear interest from a date thirty days after the sending of notice of settlement hereinafter provided for, until full payment thereof shall be made." This provision is mandatory on the Comptroller, and I think was executed by him according to its legal effect.

I think the action of the Comptroller should be confirmed and the writ of *certiorari* quashed, with fifty dollars costs and disbursements against the relator.

Judgment for modifying decision of Comptroller by deducting from aggregate of taxes and penalties the excess of the penalties over ten per cent, and as so modified confirmed, without costs, such excess to be restored to the relator.